JAMES K. LUDWICKSON, APPELLEE, V. CENTRAL STATES ELEC-
TRIC COMPANY ET AL., APPELLANTS.

281 N. W. 603

FILED OCTOBER 11, 1938. No. 30432.

*Stewart, Stewart & Whitworth,* for appellants.

*Alfred D. Raun, contra.*

Heard before ROSE, C. J., EBERLY, CARTER and MESSMORE,
JJ.

MESSMORE, J.

This is an appeal from the district court for Thurston

county, wherein the court, affirming the compensation court, found for James K. Ludwickson, the plaintiff, fixing the amount of his disability as total and permanent, within the meaning of the workmen's compensation law, for the reason that, solely because of said injuries, he is unable to perform any substantial amount of labor, either in his particular line of work or any other for which he would be fitted except for the injuries that he received in said accident. The court granted compensation at the rate of $13.07 each week for a period of 300 weeks from and after the 30th day of June, 1935, and thereafter the sum of $8.82 each week for the remainder of plaintiff's natural lifetime, less the amount of $1,725.24, which has been paid by defendants to the plaintiff. Defendants appeal from the judgment and decree.

There is no controversy relative to the occurrence of the accident by which plaintiff was injured; nor is there a denial that plaintiff was injured in the course of his employment. Stipulation of the parties discloses the payment of compensation as above set out, together with medical expenses, and it is agreed that plaintiff's wages at the time of the accident were $19.60 a week.

Plaintiff was a graduate of high school, Junior college, and the University of Nebraska, with an A. B. degree in mechanical engineering. At the time of the accident he was 25 years of age. He went to work for the defendant company September 17, 1933, as a Diesel engine operator. The injury to the plaintiff occurred June 30, 1935, when some 6,600 volts of electricity passed through and over his body. Plaintiff worked alone, and was on duty approximately eight hours a day, seven days a week, at the time of the accident, and was in charge of defendant's plant at Walthill, Nebraska, which served several towns and the rural community.

Dr. G. W. Briggs, a Walthill physician, was called immediately and found plaintiff lying on the floor of the substation of the plant in a coma, his pulse imperceptible, and saliva coming from his mouth. Doctor Briggs testified that

plaintiff had third degree burns on his chest and abdomen, on the back and left thigh, and on his left arm and hand; that the flesh was cooked; that the bones in his hands were visible; that the area of the burns on his chest and abdomen "extends diagonally across from the anterior part of the ilium, hip bone, up to the neck, and over to the back side of the sternum, the breastbone," taking in most of the chest on the left; that the burn on his chest and the front part of his body extended approximately from the point of his hip upwards, including practically all of the left side of his chest and going over to the right side of the breastbone, angled down to a point at the hip; destroyed all or part of the left pectoralis major muscle; that the burn on the back covered an area of eight by ten inches, mostly on the left side; extended over the backbone or spine a little; that the burn on the thigh was "almost as wide as the one on his back, practically eight by ten" inches, on the outer aspect of his left thigh; that the burn on the left arm or hand extended up to within four and a half or five inches of the elbow joint; "there was a burn at the anterior cubital fossa, the anterior aspect of the elbow;" the inner part; two burns under the armpit; clothing was charred, some of it burned off. Doctor Gramlich, the family physician, arrived, and subsequently the plaintiff was removed to a hospital in Walthill, and later to a hospital in Sioux City, Iowa. The witness further testified that plaintiff also had third degree burns on his feet; "the scar on the left foot is at the base, is on the sole of the foot below the first toe, that is the small toe. The one on the right foot runs from below the second toe longitudinally with the sole of the foot," back of the toes. The evidence further discloses that the left hand and wrist and forearm had been amputated four and one-half inches below the elbow joint, and on the left upper arm there was a scar on the anterior cubital fossa about three by four or possibly five inches; the condition of the remaining portion of the stump "is atrophied to a certain extent, and there is a scar on the stump;" plaintiff has limited motion of the stump, "due to the scar on the

tendon of the biceps muscle, and also to atrophy of that muscle." The doctors who testified found substantially the same scars and burned areas as testified to by Doctor Briggs.

The plaintiff followed the occupation of a Diesel engine operator. There were many duties to be performed in the course of his employment which necessitated, without question, the use of two hands, especially in starting the engines and in the use of heavy wrenches, weighing from 25 to 150 pounds. Some of the duties of a Diesel operator, as enumerated by the witness Dingwall, chief engineer of the defendant company, may be summarized as follows: In the plant in which plaintiff was employed were three engines, one 360, one 240, and one 100 horsepower, and the capacity of the plant was 700 horsepower, developing 460 kilowatts that generated 2,300 kilowatts, and stepped up in the substation to 6,600 kilowatts. In order to start the Fairbanks-Morse and Diesel engines, it was necessary to go into the basement, "turn the air on and then turn the water valves open and let the water circulate through the engines. * * * Hold the governor down with one hand and raise the air valve with the other to start it rolling over. And after it gets rolling it will start firing itself." This operation takes two hands. Due to plaintiff's injuries, he could not start the engine, for the reason that one hand is necessary to regulate the valve and one to regulate the governor. To "spot the engine" before starting it, it is necessary to use a big bar, place it in a hole in the flywheel to pull the engine over. The weight of the bar is about 40 pounds, and the length five feet, and the hole through which the bar is inserted is approximately five feet from the ground. The witness testified that a man could not perform this task with one hand; that salt is used in the softening of the water and is kept in the basement in 100-pound bags; that a man having only one hand would not be able to handle the bags and put the salt into the softener; that while the engines are being operated they require adjustments from time to time, and the plaintiff would be unable to make an

adjustment on the oil or fuel pump, for the reason that it necessitates the use of two hands; that two wrenches are required which must be operated simultaneously. As a Diesel operator the plaintiff would be required to make frequent inspections of the engines, necessitating adjustments of the fuel pump, or the engines would be ruined. Among plaintiff's duties was that of taking out the pistons and rings, which require removal of the cylinder head and plates from the side of the engine being repaired. The cylinder head is located about ten feet above the floor, and the side plates are in front as one stands up to it. The cylinder heads weigh 250 pounds and are taken off with hoists, and require the use of 25-pound wrenches. An extension of the wrench is used to tighten and loosen the nuts, the extension consisting of two-inch pipe, about four feet long. Work must also be done by the operator at times on the manifold, which consists of taking off the heads of the manifold at one end and cleaning out the carbon, reaching back the full length of the engine, which requires the use of both hands in taking the plate off. The pistons in the large engine are $15\frac{1}{4}$, in the middle engine $12\frac{1}{4}$, and in the Fairbanks 14 inches in diameter. It would be impossible for a man with one arm to remove the pistons. At times the fuel nozzles on the injection valves have to be cleaned and the valves ground, which requires the use of two hands. A Diesel operator is on his feet 80 to 90 per cent. of the time while on duty. The engine repair work is done off the floor. The engines are taken down and overhauled every three months. The water jacket is taken off at the same time. The fuel valves of the engine are ground every two weeks, requiring the use of two hands. The witness further testified that the plaintiff was disabled 100 per cent. as a Diesel operator, and that, as chief engineer in charge of the plant, he would not employ the plaintiff in his present condition.

The doctors testifying for defendants placed the permanent disability of plaintiff, taking into consideration all of the injured members of his body, at the rate of 75 per cent.

industrial disability and as a Diesel operator; while the physicians testifying for plaintiff placed his permanent disability at 100 per cent. This is the only conflict in the testimony given by the doctors. Suffice it to say that the doctors testified as to the scars and burned areas substantially as did Doctor Briggs. We therefore refrain from further extending this opinion by setting out the testimony of such witnesses.

The evidence further discloses that prior to the accident plaintiff was in excellent health, slept soundly at night and did not roll and toss in his sleep, while subsequent thereto he rolls and tosses in his sleep; that, in fact, it is dangerous for one to sleep in the same bed with him; that since the accident his body is subject to a quivering sensation and shivering when subjected to a change in temperature; that he is restless and complains of distress after eating.

The plaintiff had seven skin-grafting operations, the skin being taken from his thighs, covering an area 16 by 12 inches. The evidence shows that his clothes irritate his body and that he cannot bring his artificial arm closer to his mouth than seven and a half inches, and cannot lift anything of consequence with his left arm; that the scar on his lower abdomen is painful, and that the scars on his body produce a continual itching sensation, which makes him nervous and ill at ease under almost any circumstances; that he is conscious of the scars on his feet, even when he has his feet off the floor; that his feet are irritated and uncomfortable, and that he makes an effort to stay off his feet as much as possible. The burns on plaintiff's feet were near the transverse arch, and the nerve tissue was injured, as well as other structures in that area. There is limitation of motion in plaintiff's trunk, due to the burned area on his body. While such limitation is apparently slight, it is none the less annoying and irritating. There is considerable soreness and tenderness over the stump of the left arm and in the left elbow. Analyzing the evidence, it is obvious that plaintiff is under a continuous nervous strain.

In September, 1936; plaintiff enrolled at the University

of Nebraska, attending the university as a student to obtain his master's degree in mechanical engineering. He receives wages in the amount of $40 a month as a graduate assistant. He experiments with a miniature Diesel engine of 5 horsepower. He is at the university eight hours a day, six days a week, and on certain afternoons he is on his feet for four hours at a time while experimenting. There is also evidence that the plaintiff had washed and polished his automobile on occasions and that on the day of the trial he had driven his car to Pender. The appellants contend that the evidence is insufficient to support the finding and judgment of the trial court.

The case of *Wingate v. Evans Model Laundry*, 123 Neb. 844, 244 N. W. 635, is cited by both the appellants and the appellee. In that case it was held: "A workman, who, solely because of his injury, is unable to perform or to obtain any substantial amount of labor, either in his particular line of work, or in any other for which he would be fitted except for the injury, is totally disabled within the meaning of the workmen's compensation law."

The appellants contend that plaintiff was fitted for the work which he is now doing as a graduate assistant in the university, and that such is a substantial amount of employment, within the meaning of the holding in the *Wingate* case. It must be remembered that the plaintiff had equipped himself as a Diesel engine operator. He was a mechanical engineer, which implies that he had the ability, the technique and qualifications to handle the mechanics of an engine, and had sufficient training as an operator in a Diesel plant.

While we respect the testimony of the doctors as to the degree of disability of plaintiff, we must couple such testimony with that of an expert in the line of work for which plaintiff was fitted, as to whether or not he could substantially perform such labor. The evidence shows that for industrial purposes, in his own line of work and for manual labor he is totally and permanently disabled at least 75 per cent., and some of the experts testified that he was 100 per cent. disabled. His present occupation, if it may be called

such, is that of a graduate assistant, while he is making an effort to rehabilitate himself. Whether or not he could obtain such employment, in the absence of becoming a candidate for his master's degree, is not shown by the record and is purely speculative and conjectural. Should he obtain his master's degree, his employment in the future is also speculative and conjectural. Considering the evidence in its entirety, we believe that the holding in *Wingate v. Evans Model Laundry, supra,* does apply.

"It has long been the policy of this court to give a liberal construction to the workmen's compensation law, so that its beneficent purposes may not be thwarted by technical refinement of interpretation. *Maryland Casualty Co. v. Geary,* 123 Neb. 851, 244 N. W. 797." *Wilson v. Brown-McDonald Co.,* 134 Neb. 211, 278 N. W. 254.

The trial judge was in a vastly better position than is this court to determine the weight to be given the testimony of the medical experts. He had the opportunity to observe the demeanor of the witnesses while testifying, and was better able to judge of their fairness and credibility than is this court from the record. In fact, the trial judge had a superior opportunity to thoroughly ascertain the facts. In addition, he had the opportunity to, and did, view the scars and burned area on the plaintiff's body, and from his examination of all the evidence, he concluded that plaintiff had a total and permanent disability.

In *Nebraska National Guard v. Morgan,* 112 Neb. 432, 199 N. W. 557, this court permitted recovery for total and permanent disability where the direct result of the injuries sustained by the employee was a fracture of the surgical neck of the femur in his left hip, and where the injury left broken ends of bone in the hip, resulting in misplacement of the hip, and causing irritation of the nerves coming into the hip, and affecting his whole physical and nervous system, in such manner as to totally disable the claimant from doing any work. We have in the case at bar a situation of the same nature, where the whole physical and nervous system of the plaintiff is affected by the numerous burns

sustained over different parts of his body, as above set out.

Total and permanent disability, within the meaning of the workmen's compensation law, is that disability which is deemed total to do work of any reasonable character within the intendment of the law, when it appears that the employee, due to his physical injuries, is unable to perform work of the same or similar description as he is accustomed to perform, or is unable to obtain any substantial amount of labor in his particular line of work, or in any other for which he would be fitted except for the injury, and what little he may subsequently learn to do thereafter will be done under serious difficulties, placing him at an indubitable disadvantage in securing work that he may be able to perform. The disability suffered by the plaintiff in the case at bar follows the conception of total and permanent disability, as herein stated.

In compliance with the provisions of section 48-125, Comp. St. Supp. 1937, the attorney for appellee is allowed the sum of $150 as fee for services in this court.

For the reasons given in this opinion, the judgment of the district court is

AFFIRMED.